UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
SUMAYA YOUSEF, as Administrator of the Estate
of BASSEM YOUSEF, deceased,

                                        Plaintiff,

        - against -                                                **OPINION & ORDER**

COUNTY OF WESTCHESTER; KEVIN M.                              No. 19-CV-1737 (CS)
CHEVERKO, individually, and as Commissioner of
Corrections; and JOHN DOES 1-12, being
Westchester County Department of Correction
Warden, Administrators, Supervisors and/or
Officers,

                                        Defendants.
---------------------------------------------------------------x

Appearances:

Dennis W. Light
Raneri, Light & O'Dell, PLLC
White Plains, New York
*Counsel for Plaintiff*

Denise M. Cossu
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
White Plains, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is the motion to dismiss of Defendants County of Westchester (the

"County"), Kevin M. Cheverko, and John Does 1-12, (collectively, "Defendants").  (Doc. 31.)

For the following reasons, the motion is GRANTED.

I.     **BACKGROUND**

The Court accepts as true the facts, but not the conclusions, set forth in Plaintiff's Second

Amended Complaint.  (Doc. 27 ("SAC").)[1]

A.     **Facts**

1.     **Bassem Yousef's Death**

On June 14, 2017, Bassem Yousef ("Bassem"), Plaintiff Sumaya Yousef's son, died as a

result of asphyxia by hanging while being held as a pretrial detainee at the Westchester County

Jail ("WCJ").  (*Id.* ¶ 34; *see id.* ¶ 46 (Bassem brought to "WCJ for pre-hearing detention").)

Two weeks earlier, on June 1, 2017, Bassem was arrested in Kings County, New York,

on drug and motor vehicle misdemeanor charges while on parole for a 2015 felony charge.  (*Id.*

¶¶ 43, 45.)  Bassem posted bail but did not appear in court as scheduled on June 5, so a warrant

issued for his arrest.  (*Id.* ¶ 44.)  A parole warrant was also lodged, and Bassem was arrested on

that warrant on June 9, 2017.  (*Id.* ¶ 46.)  At the time of his arrest, Bassem was in possession of

sixteen hydrocodone pills, twenty-three Xanax pills, heroin, cocaine, and Suboxone.  (*Id.* ¶ 47.)

At approximately 8:49 a.m. on June 9, Bassem was taken to the WCJ.  (*Id.* ¶ 46.)  Shortly

after 9:00 a.m., a correction officer notified a member of the WCJ's health-care staff that Bassem

needed a mental-health evaluation because he appeared incoherent and admitted drug use.

---

[1] "[T]he court must generally accept as true all of the factual assertions in the complaint. However, there is a narrow exception to this rule for factual assertions that are contradicted . . . by documents upon which the pleadings rely . . . ."  *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order) (citation omitted).  Accordingly, where Plaintiff relies on a document attached to the SAC and that document contradicts an alleged fact, the document controls.

(*Id.* ¶ 48; *id.* Ex. 6 at 6.)[2]  At 10:00 a.m., Bassem underwent a mental-health evaluation, and the clinical staff member who conducted the evaluation noted that Bassem did not express any thoughts about self-harm and was not to be placed on suicide watch.  (*Id.* Ex. 6 at 2, 4.)  At 11:00 a.m., non-Defendant Mental Health Director Dr. Jerome Norton reviewed the mental-health evaluation and confirmed Bassem's assignment to General Population.  (*Id.* ¶ 50; *id.* Ex. 6 at 6.)

At approximately 4:30 p.m., Bassem underwent another medical screening.  (*Id.* Ex. 7 at 4.)  His "Patient Problems" were listed as alcohol abuse, opioid abuse, generalized anxiety disorder, major depressive disorder, and personal history of mental disorder.  (*Id.* ¶ 49; *id.* Ex. 7 at 2, 4.)  Bassem informed the screener that he had been prescribed "Seroquel 300MG Q HS," and that he had last taken it four days earlier.  (*Id.* ¶ 49; *id.* Ex. 7 at 4, 7.)  Bassem stated that he had received treatment for substance and alcohol abuse at "Blaisedale" in January 2017, but he also reported that he took heroin intravenously daily and drank a quart of vodka daily, both of which he had last done that same day.  (*Id.* Ex. 7 at 5.)  Bassem reported that he had a history of suffering nausea, vomiting, tremors, and diarrhea as a result of withdrawal from drugs and alcohol.  (*Id.*)  Bassem reported no mental-health complaints and responded "No" to the question of whether he wanted to harm himself.  (*Id.* Ex. 7 at 6.)  The screener recommended that Bassem remain in General Population but issued a mental-health referral.  (*Id.* Ex. 7 at 8.)

Bassem received a mental-health screening later that same day, on June 9.  (*Id.* ¶ 50; *id.* Ex. 8.)  The screener, non-Defendant Nurse Practitioner Zoeth Stone-Edwards, recorded answers to eighteen yes-or-no questions that made up a "Suicide Potential Screening."  (*Id.* Ex. 8 at 2.)  Stone-Edwards answered "Yes" to two questions:  "Has psychiatric history (psychotropic

---

[2] Many of the exhibits to the SAC are not consecutively paginated, so for ease of reference, all citations to the SAC's exhibits will refer to the page numbers generated by the Court's Electronic Case Filing System, stamped at the top of each page.

medication or treatment)" and "Is apparently under the influence of alcohol or drugs." (*Id.*) Based on those answers, Stone-Edwards summarized that Bassem suffered from chronic mental illness and potential withdrawal from substance abuse, and she scheduled a routine mental-health follow-up for June 13. (*Id.* Ex. 8 at 2-3, 7.) On the referral, Stone-Edwards noted that Bassem was "reporting anxiety and depression." (*Id.* Ex. 8 at 7.) She also noted that Bassem stated that he had taken three hundred milligrams of Seroquel four days earlier, Suboxone three weeks earlier, and Xanax a year earlier. (*Id.*) She also placed him on a "Librium protocol," which appears to be a protocol involving several medications used for patients experiencing withdrawal symptoms. (*Id.* ¶ 50; *id.* Ex. 8 at 4, 6.)

At approximately 11:30 p.m. on June 11, 2017, Bassem stated to correction officers that "'if he did not get his medication, he [wa]s going to hurt himself.'" (*Id.* ¶ 51; *see id.* Ex. 9 at 3.) While Plaintiff did not identify in the SAC any of the officers to whom Bassem made this statement, Exhibit 10 to the SAC shows that "Sgt. Graham" requested that Bassem be assessed due to increased agitation. (*Id.* Ex. 10 at 3.) At 11:50 p.m., non-Defendant Registered Nurse Helene Bishop met with Bassem and observed him sitting on his bed "wringing hands, presenting with angry affect/mood, argumentative," and saying, "I need my medication, I'm going crazy, I haven't slept, I'm going to kill myself if I don't get it." (*Id.*) She reported that Bassem said he would kill himself if he did not get "his outside medication (Seroquel)." (*Id.* Ex. 9 at 5.) He was also agitated and yelled, and banged his head with his hands. (*Id.*) As a result, Bishop moved Bassem from General Population to Booking, placed him on two-day suicide watch with one-on-one constant supervision, and ordered "re-evaluation by Mental Health in am." (*Id.* ¶ 51; *id.* Ex. 9 at 2, 5; *see id.* Ex. 11 at 3 (noting that Bassem was placed on two-day suicide watch by "Nursing.").) Bishop initiated the mental-health referral and noted that

Bassem reported a history of anxiety and insomnia, as well as a history of Seroquel use, and that his "med verification [was] completed and given to pharmacy." (*Id.* Ex. 9 at 7.) That verification form, dated June 11, 2107, included Bassem's authorization for "Blaisdell Addiction" to release information about his treatment to WCJ. (*Id.* Ex. 10 at 4.)

At approximately 7:27 a.m. on June 12, 2017, non-Defendant Mental Health Professional Christina Cipollaro met with Bassem. (*Id.* ¶ 53; *id.* Ex. 11.) Her report noted that Bassem denied experiencing any suicidal thoughts at that time. (*Id.* Ex. 11 at 2.) Cipollaro's report further noted that Bassem stated that he was prescribed Seroquel 300mg while at "Blazedale," and the medication "assisted with his mood and sleep," but Bassem had signed out of the treatment program "two weeks ago," and was released without a Seroquel prescription. (*Id.* Ex. 11 at 3.) Cipollaro reported that Bassem had no suicidal ideations, but his treatment goal was to "[e]liminate self-harm gestures/statements/threats." (*Id.* Ex. 11 at 4-5.) She noted that Bassem had a risk factor because he was "[i]ntoxicated or detoxing from alcohol/other drugs," but his protective factors were that he identified "reason[s] for living," had a "[s]upportive social network of family," and was "[e]ngaged in work," as he had a job as a manager for an oil company. (*Id.* Ex. 11 at 3, 5-6.) As a result, Cipollaro recommended that Bassem be discharged from suicide watch, and she changed his mental-health score from "MH1," which requires "24 x 7 care," to "MH3," which is a "[m]ild or moderate mental health disorder (or severe mental health disorder under good control)." (*Id.* ¶ 53; *id.* Ex. 11 at 6-7.) She said Bassem could return to General Population, but she referred him for a routine visit with a mental-health professional the following day. (*Id.* ¶ 53; *id.* Ex. 11 at 8-9.)

At 1:39 p.m. on June 12, 2017, Bassem's prescriptions from "Blaisdell," including Seroquel, were verified. (*Id.* Ex. 10 at 4.)

On June 13, 2017, Bassem had his follow-up mental-health evaluation.  (*Id.* ¶ 54; *id.* Ex. 12.)  Bassem stated that his suicide threats the day before were "due to agitation from insomnia."  (*Id.* Ex. 12 at 3.)  The report noted no current suicidal ideations.  (*Id.* Ex. 12 at 4.)  As a result, the mental-health professional recommended a follow-up in seven days and maintained Bassem's mental-health score at MH3.  (*Id.* Ex. 12 at 6-7.)  The evaluator noted that Bassem had been prescribed Seroquel while in rehab.  (*Id.* Ex. 12 at 8.)

At approximately 6:56 p.m. that same day, June 13, Bassem called his girlfriend and stated that he "was going crazy and 'so if I do – do anything stupid, I just want you to know I love you, and I want you to tell everybody I love them, all right?  Did you hear me?'"  (*Id.* ¶ 55.)

On June 14, 2017, at 12:30 a.m., Bassem was in his cell walking around.  (*Id.* Ex. 5 ("Final Report") ¶ 14.)[3]  At 1:22 a.m., Bassem was lying on his bed with the lights off.  (*Id.*)  At 1:57 a.m., Bassem was found in his cell hanging by a blue cloth around his neck tied to a vent.  (*Id.* ¶ 15; SAC ¶ 56.)  A correction officer removed the cloth and provided medical assistance, and four minutes later, EMS was called.  (Final Report ¶¶ 15-16.)  EMS arrived and took Bassem to Westchester Medical Center, where he was pronounced dead at 2:55 a.m.  (*Id.* ¶ 16.)  At the time of his death, Bassem "had been receiving medication limited to detoxification, headaches, muscle pain, vitamin supplement, and diarrhea for his alcohol/opioid abuse, anxiety and depression."  (SAC ¶ 57.)

### 2.    WCJ's Alleged Past Misconduct

On November 19, 2009, the U.S. Department of Justice ("DOJ") "issued a report regarding an investigation of the WCJ that, among other things, provided '[p]rison officials may

_____

[3] On March 26, 2019, the New York State Commission of Correction issued the "Final Report of the New York State Commission of Correction:  In the Matter of the Death of Bassem Yousef," which Plaintiff attached as an exhibit to her SAC.  (Final Report at 2.)

not refuse, unreasonably delay, or intentionally interfere with medical treatment for incarcerated individuals.'"  (*Id.* ¶ 36 (quoting *id.* Ex. 3 ("DOJ Report") at 6-7).)  The DOJ found that the WCJ had "a pattern of failing to:  (1) adequately protect inmates from harm and serious risk of harm from staff; and (2) provide inmates with adequate medical and mental health care."  (DOJ Report at 8 (footnote omitted); SAC ¶ 37.)

On November 24, 2015, the DOJ and the Westchester County Department of Correction ("WCDOC"), which runs the WCJ, entered into an agreement as a result of the DOJ Report.  (SAC ¶ 38; *id.* Ex. 4 ("Agreement") at 2.)  The Agreement included a section on "Mental Health Care," and WCDOC agreed, among other things, to ensure that "[a] Qualified Mental Health Professional conducts an in-person evaluation of an inmate prior to a seclusion or restraint order, or within eight hours."  (Agreement at 10-11.)[4]  WCDOC also agreed to ensure that all

> [correction officers and superior correction officers employed by WCDOC] who directly interact with inmates receive sufficient training from a licensed medical professional on basic mental health information (*e.g.*, diagnosis, specific problematic behaviors, psychiatric medication, additional areas of concern); recognition of signs and symptoms evidencing a response to trauma; and the appropriate use of force for inmates who suffer from mental illness.

(Agreement at 11; *see id.* at 4; SAC ¶ 39.)  WCDOC further agreed to maintain "training records for at least three years and in no event less than the times set forth in New York State or other applicable requirements in a central file which, at minimum, includes course descriptions, date of courses, and notation of course curriculum."  (SAC ¶ 40; Agreement at 11.)  The Agreement would terminate no later than November 24, 2018, but could terminate as early as November 24, 2017, if WCDOC demonstrated substantial compliance.  (SAC ¶ 41; Agreement at 17-18.)

---

[4] A "Qualified Mental Health Professional" is an "appropriately qualified physician, psychiatrist, psychologist, counselor, therapist, social worker, or nurse who is competent, whether by education, training, licensure, or experience, to make the particular decision, or deliver the particular service, at issue."  (Agreement at 4.)

On or about February 11, 2017, an inmate named Alex Fusco committed suicide in his cell while in custody at the WCJ.  (SAC ¶ 42.)

### B.   **Procedural History**

On September 11, 2018, Plaintiff filed this action in Supreme Court of the State of New York, County of Westchester.  (Doc. 3-1).  Defendants removed to this Court on February 26, 2019.  (Doc. 3.)[5]  Plaintiff filed a motion to remand to state court, (Doc. 6), and Defendants filed a letter stating their intention to file a motion to dismiss, (Doc. 10).  The Court held a conference regarding Plaintiff's motion and Defendants' letter, during which Plaintiff informed the Court that she would likely withdraw her motion to remand.  (Minute Entry dated Mar. 29, 2019.)  The Court instructed the parties that if Plaintiff withdrew her motion, the parties should propose a schedule to the Court for an amended complaint and subsequent briefing on a motion to dismiss.  (*Id.*)  Plaintiff withdrew her motion and the parties submitted a proposed schedule, which the Court approved.  (Docs. 11-12.)

Plaintiff filed her First Amended Complaint on May 14, 2019.  (Doc. 17.)[6]  Defendants filed another pre-motion letter, (Doc. 19), and the Court held another pre-motion conference, (Minute Entry dated June 12, 2019).  The Court again granted Plaintiff leave to amend, and on July 26, 2019, after Plaintiff requested and received an extension, (Doc 26), she filed the SAC with fourteen attached exhibits.  The parties filed their motion papers on October 4, 2019, including Defendants' motion to dismiss, (Doc. 31), attorney declaration with seven exhibits,

---

[5] Defendants first attempted to remove on February 25, 2019, (Doc. 1), but due to a filing error, they did not successfully remove to this Court until the next day, (Doc. 3).

[6] Plaintiff first attempted to file her First Amended Complaint on May 10, 2019, (Doc. 13), but due to a filing error, she did not successfully file it until May 14, 2019, (Doc. 17).

(Doc. 32 ("Cossu Decl.")), and brief, (Docs. 33 ("Ds' Mem.")); Plaintiff's opposition, (Doc. 35 ("P's Opp."); and Defendants' reply, (Doc. 34).

Plaintiff's SAC brings three claims against the County, County Commissioner of Corrections Cheverko, and John Does 1-12, (*i.e.*, the warden, assistant warden, captain, lieutenant, sergeant, and seven correction officers at WCDOC). The first is fashioned as a "*Monell*" claim against "[a]ll Defendants" for violations of the "Eighth and/or Fourteenth Amendments" under 42 U.S.C. § 1983. (SAC ¶¶ 73-74.) The second and third are state law claims for negligence and wrongful death also against all Defendants. (*Id.* ¶¶ 75-78.)

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure

from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).[7]

### B.    Documents Properly Considered

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . , and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Incorporated Village of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)

(internal quotation marks omitted).

---

[7] The "Legal Standard" section of Plaintiff's opposition accurately summarized the applicable standard on a motion to dismiss, but in her "Qualified Immunity" section she states, "'[A]s with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" (P's Opp. at 19 (quoting *Hyde v. Arresting Officer Caputo*, No. 98-CV-6722, 2001 WL 521699, at *1 (E.D.N.Y. May 11, 2001)).) The no-set-of-facts pleading standard was retired by the Supreme Court in 2007 in *Twombly*. *See* 550 U.S. at 562-63. No lawyer should be citing it today.

Plaintiff attached fourteen exhibits to her SAC:  (1) the Court's May 15 Order granting Plaintiff permission to file her First Amended Complaint *nunc pro tunc*, (SAC Ex. 1); (2) Plaintiff's extension request and a copy of the docket as of July 26, 2019, (*id.* Ex. 2); (3) the DOJ Report, (*id.* Ex. 3); (4) the Agreement, (*id.* Ex. 4); (5) a redacted version of the Final Report, (*id.* Ex. 5); and (6-14) numerous medical and mental-health forms prepared for Bassem between June 9 and June 14, 2017, (*id.* Exs. 6-14).  The Court considers all of these documents on the instant motion, as they are all "documents attached" to the SAC and "relied upon in it." *Weiss*, 762 F. Supp. 2d at 567.

Defendants filed an attorney declaration in support of their motion to dismiss, (Cossu Decl.), and attached seven exhibits:  (1) the SAC and the fourteen exhibits described above, (*id.* Ex. A); (2) an unredacted version of the Final Report that Plaintiff filed as Exhibit 5 to her SAC, with cover letter, (*id.* Ex. B); (3) Plaintiff's Notice of Claim, dated September 11, 2017, (*id.* Ex. C); (4) Defendants' Notice of Removal, dated February 20, 2019, (*id.* Ex. D); (5) the transcript from this Court's March 27, 2019 Conference, (*id.* Ex. E); (6) Plaintiff's First Amended Complaint, (*id.* Ex. F); and (7) the transcript from this Court's June 12, 2019 Conference, (*id.* Ex. G).

The Court will, of course, consider the SAC and its exhibits.  The Court need not discuss whether it can consider the unredacted version of the Final Report, the Notice of Claim, the Notice of Removal, or the First Amended Complaint, because none of them affect the outcome of this motion.  The two transcripts are relevant only to the extent they show that Plaintiff had notice of Defendants' arguments, as well as the benefit of the Court's observations, prior to filing her amended complaints, and the Court will consider the transcripts to that end.

III.   **DISCUSSION**

A.   **Federal Claim**

Plaintiff fashions her first cause of action as a "*Monell*" claim against "[a]ll Defendants"

for violations of the "Eighth and/or Fourteenth Amendments" under 42 U.S.C. § 1983.  (SAC

¶¶ 73-74.)  But a *Monell* claim is one brought against "a municipal organization where that

organization's failure to train, or the policies or customs that it has sanctioned, led to an

independent constitutional violation."  *Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006);

*see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978) (municipality may be held liable

under 42 U.S.C. § 1983 where violation results from custom or policy).  "*Monell* does not create

a stand-alone cause of action," *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013), but rather

is a theory under which a municipality can be liable for the constitutional torts of its employees,

if that municipality's custom or policy led to that violation, *Segal*, 459 F.3d at 219.  Accordingly,

Plaintiff's "*Monell*" claim cannot be maintained against "[a]ll Defendants" as Plaintiff suggests,

because he cannot maintain this claim against the individual Defendants.  This alone is a proper

ground to dismiss Plaintiff's first claim against Cheverko and the John Does.  That Plaintiff

brought her § 1983 claim against all Defendants under the same cause of action is particularly

surprising given that the Court explained to Plaintiff at the June 12, 2019 conference that it had a

hard time understanding what claims Plaintiff was bringing and "to the extent [Plaintiff] mean[t]

to assert different claims, let's break them out."  (Cossu Decl. Ex G at 4:23-5:9.)  But even if

Plaintiff did break out her causes of action to properly assert (1) a deliberate indifference claim

against the individual Defendants and (2) a *Monell* claim against the municipality, her claims would still be dismissed.

### 1.    Individual Defendants

Plaintiff claims that "the Defendants' conduct violated [Bassem's] rights as guaranteed by reason of the Eighth/and or Fourteenth Amendments to the United States Constitution." (SAC ¶ 74.)  The Court presumes that she means to allege unconstitutional conditions of confinement based on inadequate mental health treatment.  "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment."  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017).  Accordingly, because Bassem was a pretrial detainee, Plaintiff's claim is governed by the "more plaintiff-friendly Fourteenth Amendment" standard, as opposed to the "more rigorous Eighth Amendment convicted-prisoner standard."  *Pizarro v. Bd. of Corr.*, No. 16-CV-2418, 2018 WL 3462512, at *4 n.4 (S.D.N.Y. July 17, 2018).

"While in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide."  *Kelsey v. City of N.Y.*, 306 F. App'x 700, 702 (2d Cir. 2009) (summary order).  To establish a Fourteenth Amendment violation, "a pretrial detainee must satisfy two prongs . . . , an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' . . . showing that the officer acted with at least deliberate indifference to the challenged conditions."  *Darnell*, 849 F.3d at 29.  "[T]o establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to

13

physical and mental soundness."  *Id.* at 30 (internal quotation marks and citation omitted).

"[T]he term 'subjective prong' might be a misleading description" because "'deliberate

indifference' roughly means 'recklessness,' but 'recklessness' can be defined subjectively (what

a person actually knew, and disregarded), or objectively (what a reasonable person knew, or

should have known)."  *Id.* at 29.

> Therefore, to establish a claim for deliberate indifference to conditions of
> confinement under the Due Process Clause of the Fourteenth Amendment, the
> pretrial detainee must prove that the defendant-official acted intentionally to
> impose the alleged condition, or recklessly failed to act with reasonable care to
> mitigate the risk that the condition posed to the pretrial detainee even though the
> defendant-official knew, or should have known, that the condition posed an
> excessive risk to health or safety.

*Id.* at 35.

### a.   Personal Involvement

Before reaching the merits of Plaintiff's deliberate indifference claim as against the

individual Defendants (to the extent she brought one), the Court must first determine whether

Plaintiff sufficiently pleaded that the Defendants were personally involved in the alleged

violation of Bassem's rights.  "It is well settled in this Circuit that personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

§ 1983," *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted),

and thus "'a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the Constitution,'" *Thomas v. Venditto*, 925 F. Supp. 2d 352,

363 (E.D.N.Y. 2013) (quoting *Iqbal*, 556 U.S. at 676).

Defendants argue that "there are no factual allegations that either Cheverko or any one of

the John Doe Defendants had any personal involvement in the decisions and actions that Plaintiff

alleges were 'substantial factors' in [Bassem] Yousef's suicide."  (D's Mem. at 16.)  Plaintiff

first responds with a section titled, "Defendants John Doe 1-12 Were Deliberately Indifferent to

[Bassem's] Serious Medical Conditions."  (P's Opp. at 6-12.)  Yet in that six-page section, Plaintiff fails to identify a single allegation against a specific Defendant.

For example, Plaintiff asserts, "From [Bassem's] processing on June 9, 2017, to the time of his death on June 14, 2017, the facts reveal that Defendants never provided [Bassem] with his prescribed medication, . . . Seroquel, during his pre-trial detention, which prescription was duly verified by the Defendants on June 12, 2017, by [Bassem's] Authorization dated June 11, 2017." (*Id.* at 11 (footnote omitted).)  But Plaintiff failed to identify any specific Defendant that refused to provide Seroquel to Bassem and, in fact, failed to plausibly allege that any Defendant could have done so.  While medical personnel, not Defendants, verified Bassem's prescription for Seroquel, (SAC Ex. 9 at 7; *id.* Ex. 10 at 4), Plaintiff does not allege that the prescription was filled or available, and thus she has not plausibly alleged that Defendants could have provided Bassem with his medication, let alone that they had it and intentionally or recklessly withheld it from him.  And Plaintiff's argument cannot be that the warden, assistant warden, captain, lieutenant, sergeant, or seven correction officers – none of whom are medical professionals – are at fault for not writing or filling the prescription, as none of them had the ability to do so.[8]

In fact, a review of Plaintiff's SAC and exhibits shows that Plaintiff's allegations vaguely pleaded against "Defendants" are not allegations against Defendants at all, but rather are allegations stemming from actions and omissions of WCJ's medical staff.  For example, Plaintiff

---

[8] Plaintiff has also not plausibly alleged that Bassem's lack of Seroquel was the cause of his suicide.  The SAC refers to no medical opinion and otherwise contains no facts suggesting that Bassem would not have killed himself if he had had a dose of Seroquel between the verification of the prescription on the afternoon of June 12 and the early morning of June 14. Nor does the SAC suggest that the medications prescribed for him while he detoxified were not appropriate for his condition.  And, as discussed below, it is well settled that disagreement with a chosen course of treatment is not a basis for a claim of constitutionally inadequate medical care. *See, e.g.*, *Jacks v. Annucci*, No. 18-CV-3291, 2019 WL 3239256, at *4 (S.D.N.Y. July 18, 2019) (collecting cases).

alleges that Bassem's Seroquel "prescription was verified by Defendants," and Plaintiff cites to Exhibit 10 to the SAC to support her assertion.  (SAC ¶ 52.)  But Exhibit 10 shows that that non-Defendant Registered Nurse Helene Bishop sought to verify Bassem's medications.  (*Id.* Ex. 10 at 4.)  Thus, Plaintiff's attempt to attribute this allegation to all "Defendants" need not be accepted as true, as Exhibit 10, on which Plaintiff relies, makes clear that it was a non-Defendant who followed up on Bassem's prescription.  *See Perry*, 424 F. App'x at 25 ("[T]he court must generally accept as true all of the factual assertions in the complaint.  However, there is a narrow exception to this rule for factual assertions that are contradicted . . . by documents upon which the pleadings rely . . . .") (citation omitted); *Sobek v. Quattrochi*, No. 03-CV-10219, 2004 WL 2809989, at *2 (S.D.N.Y. Dec. 8, 2004) ("While the Court must accept the allegations in the complaint as true, to the extent any allegations directly contradict evidence contained in the documents relied upon by a plaintiff, the documents control, and the allegations need not be accepted as true."); *see also Utica Mut. Ins. Co. v. Munich Reinsurance Am. Inc.*, 976 F. Supp. 2d 254, 259-60 (N.D.N.Y. 2013) (plaintiff cannot dispute accuracy of document on summary judgment where it attached it to complaint, treated it as accurate and relied on it), *vacated and remanded on other grounds*, 594 F. App'x 700, 702 (2d Cir. 2014) (summary order) (agreeing with district court that plaintiff cannot dispute accuracy of document on summary judgment that it attached to its complaint); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010) (court need not accept as true allegations contradicted by document that is part of complaint).[9]

---

[9] Where a plaintiff alleges that a document attached to or referenced in a complaint is false, the Court may consider that document for the fact of the statements contained in it, not for the truth of those statements.  *See Colon v. City of Rochester*, 419 F. Supp. 3d 586, 594-95 (W.D.N.Y. 2019).  But here Plaintiff, in both the SAC and her opposition to the instant motion, consistently relies on the veracity of the attached documents.

Plaintiff also alleges that "the Defendants removed [Bassem] from Suicide Watch, downgraded his mental health classification from MH1 to MH3, returned him to General Population and issued a routine mental health referral," and cites to Exhibit 11 to support those allegations. (SAC ¶ 53.) But again, Exhibit 11 shows that it was non-Defendant Mental Health Professional Christina Cipollaro who terminated Bassem's suicide watch, changed his mental-health classification, recommended he be returned to General Population, and referred him for another mental-health screening. (*Id.* Ex. 11 at 7-9.) Exhibit 11 specifically indicates that "Nursing," not any of the Defendants, placed Bassem on suicide watch. (*Id.* Ex. 11 at 3.) The document controls, and thus the Court need not accept as true Plaintiff's allegation that "Defendants" removed Bassem from suicide watch, downgraded his mental-health classification, or returned him to General Population. A review of each of Plaintiff's allegations regarding the insufficiency of Bassem's medical treatment similarly shows that it was undertaken by identifiable medical personnel, not Defendants.

Plaintiff next argues that the John Doe Defendants should have been aware that Bassem "needed some form of immediate mental health treatment including heightened monitoring and safety precautions." (P's Opp. at 12.) But Plaintiff fails to offer any plausible allegations that a Defendant was made aware of Bassem's risk to himself, yet failed to act to mitigate that risk. The only allegations that could have plausibly put Defendants on notice of Plaintiff's risk to himself were (1) that Bassem was "incoherent" when he arrived at WCJ and (2) that Bassem said he would hurt himself if he did not get his medication on June 11. (SAC ¶¶ 48, 51.) But Plaintiff's SAC and exhibits show that Defendants took immediate action in both instances. For the former, a correction officer issued a mental-health referral for Bassem less than fifteen minutes after he arrived at WCJ. (SAC ¶ 46 (Bassem arrived at WCJ at approximately 8:49

a.m.); *id.* ¶ 48 (mental health referral issued due to incoherent appearance and admitted drug use); *id.* Ex. 6 at 6 (mental-health referral ordered at 8:59 a.m.).)  For the latter, Plaintiff's SAC and exhibits show that after Bassem threatened to hurt or kill himself, a sergeant got him to a medical professional within twenty minutes, (*id.* ¶ 51 (Bassem made threat of self-harm at 11:30 p.m.); *id.* Ex. 9 at 3 (mental health staff notified at 11:50 a.m.); *id.* Ex. 9 at 5 (at approximately 11:50 p.m., Registered Nurse Helene Bishop met with Bassem)), after which he was placed on suicide watch, (*id.* ¶ 51; *id.* Ex. 9 at 5; *id.* Ex. 11 at 3).

While Plaintiff also alleges that Bassem made a call to his girlfriend only a few hours before his death suggesting that he might hurt himself, Plaintiff does not allege that any Defendant heard what Bassem said on that call.  (*Id.* ¶ 55.)[10]  To whatever extent the other allegations in the SAC might suggest that Bassem's mental-health history and risk factors were known to medical personnel but ignored, Plaintiff has failed to allege that that information was known by Defendants, as nearly every allegation in the SAC – *e.g.*, taking Bassem off of suicide watch and putting him in General Population, and not obtaining a Seroquel prescription quickly enough – relates to non-Defendants.[11]

Plaintiff also argues that Cheverko was personally involved because "personal involvement by a County Sherriff has been found where there was a failure 'to properly train or supervise the County Deputies with regard to the proper treatment and screening of pretrial

---

[10] In opposition to Defendants' motion, Plaintiff argues that Defendants ignored Bassem's "cries of anguish in the hours, or perhaps minutes, before he died." (P's Mem. at 17-18.)  But the SAC does not offer any facts supporting such an argument.  It refers generally to expressions of anguish and pleas for medical assistance in days before June 14, (*see* SAC ¶¶ 60, 63), as described above, but not to any outcry in the hours before Bassem's death.

[11] The Court does not mean to suggest that any of the medical personnel violated Bassem's rights.  To the contrary, as discussed below, they were not deliberately indifferent to his situation.

detainees, which . . . [would] also plausibly allege[] County acquiescence in such a policy.'"
(P's Opp. at 18 (alterations added) (quoting *Case v. Anderson*, No. 16-CV-983, 2017 WL
3701863, at *26 (S.D.N.Y. Aug. 25, 2017)).)  This argument is rejected because Plaintiff distorts
the law and the case on which she relies.  In *Case*, the court found that the sheriff was personally
involved because he took the Defendant into custody.  2017 WL 3701863, at *12 n.13 (rejecting
argument that plaintiff had not alleged personal involvement of county sheriff because plaintiff
"allege[d] that 'following the arraignment in the Town of Poughkeepsie Justice Court,
[deceased] was taken into custody *by the Dutchess County Sheriff* and placed in the Dutchess
County Jail.'  The Court must accept this fact as true.") (emphasis in original) (citation omitted).
The plaintiff also plausibly alleged that that the sheriff knew of the deceased's mental health
issues from prior incarcerations.  *Id.* at *12.  Because the plaintiff there had "plausibly alleged
the Sheriff was involved in the alleged acts and omissions . . . a reasonable inference exists that
he failed to properly train or supervise the County Deputies with regard to the proper treatment
and screening of pretrial detainees, which also plausibly alleges County acquiescence in such a
policy."  *Id.* at *26.  *Case* thus stands for the proposition that if a complaint plausibly alleges that
a sheriff was personally deliberately indifferent, it may also sufficiently suggest that he failed to
train his staff, thereby plausibly supporting a *Monell* claim – but the threshold issue is still
whether the individual was personally involved.  *Id.* ("*Because Plaintiff has alleged a degree of
personal involvement by the Sheriff* . . . the claims against the County cannot be dismissed at this
juncture.") (emphasis added).

While supervisory personnel arguably can be held liable on a failure-to-train theory,[12] "a defendant cannot be liable for a constitutional violation merely because he occupies a position of authority or is in the chain of command of the prison hierarchy." *Cox v. Fischer*, No. 13-CV-343, 2014 WL 843897, at *2 (W.D.N.Y. Feb. 27, 2014). Thus, the "conclusory assertion, unsupported by any factual allegations, that [the supervisor] failed to properly train and supervise his subordinates does not suffice to establish personal involvement in the alleged constitutional violations." *Id.* (collecting cases). Supervisory liability based on negligent training or supervision cannot rest on boilerplate allegations devoid of specifics, which is all Plaintiff has proffered here. *See Phillips*, 2018 WL 4572971, at *8 (collecting cases). Plaintiff has failed allege that Cheverko had any personal involvement in Bassem's death, and as such, no § 1983 claims can be maintained against him.

In sum, Plaintiff cannot hold the individual Defendants responsible for acts and omissions of non-Defendants. Plaintiff has not pointed to any "individual actions" by any Defendant that led to a deprivation of Bassem's rights, *Thomas*, 925 F. Supp. 2d at 363, and thus has not met the prerequisite that Defendants were personally involved, *Colon*, 58 F.3d at 873; *see also Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."). Accordingly, Plaintiff's federal claim against the individual Defendants is dismissed.

---

[12] While *Colon* suggested that personal involvement of supervisory personnel could be shown by gross negligence in supervising subordinates or otherwise passively failing to act, 58 F.3d at 873, there is a good argument that such theories of liability do not survive *Iqbal*, 556 U.S. at 677. *See Phillips v. City of Middletown*, No. 17-CV-5307, 2018 WL 4572971, at *8 n.7 (S.D.N.Y. Sept. 24, 2018).

b.     <u>Deliberate Indifference</u>

Even if Plaintiff had adequately alleged personal involvement, she has not plausibly

alleged that any individual, let alone any Defendant, was deliberately indifferent to Bassem's

medical needs.

The so-called "subjective" or "*mens rea*" prong of the deliberate indifference test under

the Fourteenth Amendment is now "defined objectively," *Darnell*, 849 F.3d at 35, meaning that a

plaintiff must demonstrate that the defendant acted intentionally or with "objective recklessness,"

*Overstreet v. Virts*, No. 14-CV-6582, 2019 WL 1331567, at *17 (W.D.N.Y. Mar. 25, 2019)

(citing *Darnell*, 849 F.3d at 35); *see also Bruno v. City of Schenectady*, 727 F. App'x 717, 720

(2d Cir.) (summary order) (applying objective standard to second prong of deliberate

indifference claim asserted by pretrial detainee), *cert. denied*, 139 S. Ct. 259 (2018); *Davis v.*

*McCready*, 283 F. Supp. 3d 108, 117 (S.D.N.Y. 2017) ("[T]he *mens rea* prong of a deliberate

indifference claim brought by a pretrial detainee is now to be assessed objectively.").  To plead

this prong, a detainee can allege "either that the defendants *knew* that failing to provide the

complained of medical treatment would pose a substantial risk to his health or that the

defendants *should have known* that failing to provide the omitted medical treatment would pose a

substantial risk to the detainee's health."  *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir.

2019) (emphasis in original).  But "prison officials . . . may be found free from liability if they

responded reasonably to the risk, even if the harm ultimately was not averted."  *Farmer v.*

*Brennan*, 511 U.S. 825, 844 (1994).

Plaintiff has failed to demonstrate that Defendants acted with objective recklessness.

While WCDOC personnel could have theoretically taken steps that would have prevented

Plaintiff's death, they responded "reasonably" to the risk presented by Bassem, although his

death "ultimately was not averted."  *See id.*   When Bassem arrived at the WCJ and stated that he was under the influence of drugs and alcohol, Defendants made a mental-health referral.  (SAC ¶ 48; *see id.* Ex. 6).  Two hours later, Bassem met with a mental-health professional who cleared him for placement in General Population and also discussed Bassem's prescription of Seroquel. (*Id.* ¶ 49; *see id.* Ex. 7.)  Following this screening, medical and mental-health professionals conducted regular assessments of Bassem, at least once per day.  (*See id.* Ex. 5 at 3-5).

Further, when Bassem stated that he would hurt or kill himself if he did not get his medication, he was taken to a medical professional within twenty minutes.  (*Id.* ¶ 51; *see id.* Ex. 9 at 3, 5).  He was then placed on suicide watch and issued an "urgent" mental-health referral (by non-Defendant Bishop).  (*Id.* ¶¶ 51-52; *see id.* Exs. 9-11).  Approximately seven hours later, a medical professional (non-Defendant Cipollaro) conducted a "Suicide Watch Initial Assessment," in which Bassem denied any suicidal ideations.  (*Id.* Ex. 11 at 2).  Additionally, Cipollaro noted that Bassem had not had a prescription for Seroquel for two weeks prior to his incarceration, (*id.* Ex. 11 at 3), which suggests that there was no immediate need to fill his prescription to prevent self-harm.  But even still, WCDOC personnel promptly sought to verify that prescription, (SAC Ex. 10 at 4; *see id.* Ex. 9 at 7), which further establishes that reasonable steps were taken to protect Bassem.  Against this backdrop, that Bassem did not get Seroquel in the day and a half between the verification and his death does not suffice to plausibly suggest deliberate indifference, even though the steps prison employees took "were insufficient in hindsight to prevent [his] suicide."  *Kelsey*, 306 F. App'x at 703.  This is especially so given the absence of facts showing that a dose of Seroquel given sooner would have prevented Bassem from taking his own life.  (*See* note 8 above.)

In sum, even assuming Defendants were personally involved in Bassem's tragic death, Plaintiff has failed to plausibly allege that they acted recklessly or were deliberately indifferent to the serious risk that Bassem posed to himself.  To the contrary, Plaintiff's allegations in the SAC and its exhibits show that the individuals who interacted with Bassem while he was incarcerated at WCJ took "affirmative and reasonable steps to protect [the] detainee[] from suicide." *Kelsey*, 306 F. App'x at 703.  Plaintiff here has at best plausibly alleged that individuals "misjudged the risk of suicide," but that is "not enough to establish objective recklessness." *Ryan v. County of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *6 (E.D.N.Y. Jan. 10, 2018); *see Jacks*, 2019 WL 3239256, at *4 (disagreement with treatment does not evidence deliberate indifference); *Washington v. Westchester County Dep't of Corr.*, No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) (medical malpractice or incorrect medical judgment does not amount to deliberate indifference) (collecting cases); *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (no deliberate indifference where prison authorities reacted to plaintiff's mental illness and self-harm, even if not in fashion plaintiff preferred).

Accordingly, to the extent that Plaintiff brought deliberate indifference claims against Cheverko and the John Doe Defendants, those claims are dismissed.[13]

### 2.     *Monell* Claim

The Court need not address *Monell* liability because the underlying constitutional claim does not survive.  "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an

---

[13] Because Plaintiff failed to state a claim against the individual Defendants, I need not address their qualified immunity argument.

independent constitutional violation." *Segal*, 459 F.3d at 219 (emphasis in original).

"Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort

in violation of federal law committed by the municipal actors and, in addition, that their

commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No.*

*1*, 727 F.3d 248, 253 (2d Cir. 2013).  Here, Plaintiff has failed to plausibly allege that Bassem

suffered a constitutional tort, as discussed above, and therefore, Plaintiff cannot maintain a

*Monell* claim.

Even if Plaintiff had established that Bassem suffered a constitutional violation, she

would not have plausibly stated a *Monell* claim. "To hold a [municipal defendant] liable under §

1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove

three elements:  (1) an official policy or custom that (2) causes the plaintiff to be subjected to

(3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)

(alteration and internal quotation marks omitted).  To plausibly allege an official policy or

custom, the plaintiff must plead:

> (1) the existence of a formal policy officially endorsed by the municipality;
> (2) actions taken or decisions made by municipal officials with final decision
> making authority, which caused the alleged violation of plaintiff's civil rights; (3) a
> practice so persistent and widespread that it constitutes a custom of which
> constructive knowledge can be implied on the part of the policymaking officials; or
> (4) a failure by policymakers to properly train or supervise their subordinates,
> amounting to "deliberate indifference" to the rights of those who come in contact
> with the municipal employees.

*Betts v. Shearman*, No. 12-CV-3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (internal

quotation marks and emphasis omitted), *aff'd*, 751 F.3d 78 (2d Cir. 2014).  "[M]ere allegations

of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or

supervision are insufficient to demonstrate the existence of such a custom unless supported by

factual details." *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13

(S.D.N.Y. Mar. 26, 2015).  Further, "[t]he deliberate indifference standard is 'stringent' and requires 'proof that a municipal actor disregarded a known or obvious consequence of his action.'"  *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *5 (N.D.N.Y. Nov. 26, 2014) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).  "While a court may not apply a heightened pleading standard to *Monell* claims, 'boilerplate' conclusions as to municipal liability will not suffice, even at this early stage of the litigation."  *Betts*, 2013 WL 311124, at *15 (citation omitted).  To survive a motion to dismiss a claim of municipal liability based on failure to train, "a plaintiff must plausibly allege a specific deficiency in the municipality's training."  *Tieman*, 2015 WL 1379652, at *22.

Plaintiff asserts that "Defendants John Doe 1-12 were inadequately trained to identify and address [Bassem's] serious medical conditions and, as a result, they were deliberately indifferent to his said condition, which ultimately resulted in his suicide."  (P's Opp. at 15.)  But this assertion is premised on just the type of "boilerplate allegations of unconstitutional policies and practices" that courts routinely dismiss for failure to state a claim.  *Plair v. City of N.Y.*, 789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (collecting cases).  Merely stating that the County failed to train its employees, without alleging a single fact to support that assertion other than the fact that Bassem died, is insufficient.  *See Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) ("[T]he mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.") (second alteration in original) (internal quotation marks omitted); *Turczyn*, 2014 WL 6685476, at *6 (municipal liability insufficiently pleaded where complaint used label "deliberate indifference" and generically referenced failure to train, but did not "allege facts that support either conclusory notion"); *Guerrero v. City of N.Y.*, No. 12-CV-2916, 2013 WL 673872, at *2

(S.D.N.Y. Feb. 25, 2013) ("[B]oilerplate claims do not rise to the level of plausibility required to state a viable *Monell* claim.") (internal quotation marks omitted).

The closest Plaintiff comes to plausibly pleading that the County had an unconstitutional policy, practice, or custom with regard to mental-health policies is the identification of the DOJ Report and the suicide of Alex Fusco, but these allegations are insufficient, individually or collectively, to state a claim.

The DOJ Report is from 2009, which is too far removed in time for an inference that conditions were the same in 2017.  *See Moses v. Westchester Cty. Dep't of Corr.*, No. 10-CV-9468, 2017 WL 4386362, at *12 (S.D.N.Y. Sept. 29, 2017) ("Where such a gap in time [of six or seven years] exists between findings in an official report and Plaintiff's allegations, the events are too disconnected in time and personnel to plausibly allege a policy, practice, or custom . . . .") (collecting cases), *aff'd*, 739 F. App'x 66 (2d Cir. 2018) (summary order). Further, the County entered into the Agreement in 2015 as a result of the DOJ Report in an effort to improve, among other things, its treatment and screening of detainees with mental-health conditions.  And Plaintiff's SAC and exhibits show that Defendants seem to be complying with the Agreement as applied to Bassem.  (*See* Agreement at 11 (prior to seclusion or restraint order, or within eight hours, inmates must be evaluated by a mental-health professional); SAC ¶¶ 52-53 (Bassem referred to and seen by mental-health professional less than eight hours after being removed from General Population and placed under constant supervision).)  At the very least, Plaintiff points to no specific respect in which Bassem's treatment violated WCDOC's obligations under the Agreement.

Plaintiff's allegation regarding Fusco's suicide also falls short.  While a plaintiff can plausibly allege a practice, policy, or custom by alleging that the "municipality had notice of

complaints of the [constitutional violations] but repeatedly failed to make any meaningful investigation into such charges," *Outlaw v. City of Hartford*, 884 F.3d 351, 380 (2d Cir. 2018), Plaintiff has failed to do that here by merely mentioning another inmate's suicide.  To plead a *Monell* claim based on Defendants' conduct with regard to Fusco, Plaintiff must, at a minimum, plausibly allege that the previous incident was "factually similar to the present case; that any of the complaints [stemming from that incident] were substantiated or even advanced past the notice-of-claim stage; or that any of them can be plausibly connected to the alleged deprivation of the Plaintiff's constitutional rights in this case." *Stratakos v. Nassau County*, No. 15-CV-7244, 2016 WL 6902143, at *5 (E.D.N.Y. Nov. 23, 2016) (collecting cases).  Here, Plaintiff has failed to do any of those, as all she had pleaded was that Fusco, while in custody at WCJ, committed suicide.  Other than pleading that Fusco and Bassem died in the same tragic fashion, Plaintiff has pleaded nothing to suggest a similarity between the two incidents.  There is no allegation that jail personnel disregarded Fusco's mental-health issues or that he was not properly treated by Defendants or that his death led to a complaint that was substantiated or made it past the notice-of-claim stage.  Further, the cases where plaintiffs successfully plead *Monell* claims based on allegations of similar misconduct in the past all involve numerous previous incidents in which claims were actually brought.  *See Tieman*, 2015 WL 1379652, at *20 (thirteen claims in nine lawsuits over five years); *McCants v. City of Newburgh*, No. 14-CV-556, 2014 WL 6645987, at *4 (S.D.N.Y. Nov. 21, 2014) (seventeen claims over seven years), *clarified on denial of reconsideration*, 2014 WL 7398910 (S.D.N.Y. Dec. 9, 2014); *Farrow v. City of Syracuse*, No. 12-CV-1401, 2014 WL 1311903, at *8 n.7 (N.D.N.Y. Mar. 31, 2014) (fifteen claims over five years).  Plaintiff's identification of a single incident, which may or may not be factually similar to Bassem's death, and which is not alleged to have resulted in a

complaint, let alone a finding, of wrongdoing, is insufficient to establish a policy or custom, even in combination with the DOJ Report from 2009.  Accordingly, Plaintiff's *Monell* claim is dismissed.[14]

### B.     State Law Claims

In addition to her § 1983 claim, Plaintiff asserts two claims arising under New York law: a negligence claim and a wrongful death claim.  (SAC ¶¶ 75-78.)  The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Having determined that the only claims over which this Court has original jurisdiction should be dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action.  *See id.* (citing 28 U.S.C. § 1367(c)(3)).  Accordingly, Plaintiff's second and third causes of actions are dismissed without prejudice.

## IV.    LEAVE TO AMEND

Plaintiff stated, "[S]hould the Court perceive deficiencies with response to any claims, the Plaintiff respectfully requests the opportunity to amend their pleading to amplify the allegations."  (P's Opp. at 24.)

---

[14] To the extent that Plaintiff argues that the Defendants are liable under *Monell* for bringing Bassem only to "registered nurses, nurse practitioners, licensed practical nurses, and so called 'mental health professionals,' but never a psychologist or psychiatrist," (P's Opp. at 17), that argument is rejected.  Plaintiff has not provided any support for the proposition that bringing Bassem to a nurse instead of a psychologist or psychiatrist is a constitutional violation.  Additionally, the Agreement that Plaintiff attached to her SAC includes nurses and mental-health professionals in the definition of a "Qualified Mental Health Professional."  (Agreement at 4.)  Accordingly, this argument cannot be used to establish liability under *Monell*.

Leave to amend a complaint should be freely given "when justice so requires." Fed. R.

Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to

amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted).

"Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith

or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of allowance of the

amendment, futility of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir.

2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended twice, after reviewing two pre-motion letters from

Defendants stating the grounds on which they would move to dismiss, (Docs. 10, 19), as well as

having the benefit of the Court's observations during two pre-motion conferences, (Minute

Entries dated Mar. 29 and June 12, 2019). In general, a plaintiff's failure to fix deficiencies in

the previous pleading, after being provided notice of them, is alone sufficient ground to deny

leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-

58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first

amended, he clearly has no right to a second amendment even if the proposed second amended

complaint in fact cures the defects of the first. Simply put, a busy district court need not allow

itself to be imposed upon by the presentation of theories *seriatim*.") (alteration, footnotes, and

internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d

222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two

opportunities to cure the defects in their complaints, including a procedure through which the

plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the

defendants and given a chance to amend their Consolidated Amended Complaint," and

"plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiff has not suggested that she is in possession of facts that would cure the deficiencies identified in this opinion.  *See TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

Accordingly, the Court declines to grant leave to amend.

****

What happened to Bassem was a tragedy, and the Court sympathizes with Plaintiff over her loss, which – although not the result of unconstitutional conduct or redressable in federal court – must be devastating.

30

## V.    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of

Court is respectfully directed to terminate the pending motion, (Doc. 31), and close the case.

**SO ORDERED.**

Dated:  April 28, 2020
      White Plains, New York

_____
    CATHY SEIBEL, U.S.D.J.